**Ronald Dean SWARTZ, Appellant,**

v.

**STATE of Iowa, Appellee.**

No. 91–1857.

Court of Appeals of Iowa.

Aug. 6, 1993.

Philip B. Mears of Mears Law Office, Iowa City, and Ronald Dean Swartz, pro se, for appellant.

Bonnie J. Campbell, Atty. Gen., Thomas G. Fisher, Jr., Asst. Atty. Gen., Thomas J. Ferguson, County Atty., and Thomas N. Bower, Asst. County Atty., for appellee.

Heard by SCHLEGEL, P.J., OXBERGER, C.J., and SACKETT, J.

SCHLEGEL, Presiding Judge.

In this postconviction relief case, the trial court found a number of instances of questionable incidents in connection with the trial of the petitioner, but found insufficient grounds to grant postconviction relief, either because of misconduct in the trial or because of ineffective assistance of trial and appellate counsel. We hold that upon the basis of the fact findings of the trial court, petitioner's due process rights were violated, and we reverse the trial court. We set aside the

petitioner's conviction and order that petitioner be granted a new trial on the original charge.

■ Ordinarily, our review of postconviction relief proceedings is for errors of law. *Hinkle v. State*, 290 N.W.2d 28, 30 (Iowa 1980). However, when a postconviction petitioner asserts violation of constitutional safeguards—such as in the present case—we make our own evaluation based on the totality of the circumstances. This is the equivalent of de novo review. *Id.*

The trial court, in this postconviction action, found that the prosecution: (1) failed to furnish material of an exculpatory nature to Swartz, although ordered to do so; (2) presented testimony of a rebuttal witness who gave false testimony concerning his motivation for testifying; (3) questioned Swartz about prior convictions in a "highly unprofessional manner"; and (4) failed to advise defense counsel of alleged mental problems of that rebuttal witness, who was also at least an equal participant in the crime for which Swartz was being tried.

The postconviction court found that in the criminal trial Swartz's counsel filed a motion for discovery and that upon hearing the trial court sustained paragraph eight of the same:

Paragraph 8 of the Motion is sustained to the extent that the State shall furnish counsel for the defendant a copy of the statement of any witnesses that are to testify and any reports made by police officers that are to testify. The statements shall be made available to counsel for the defendant no later than April 19, 1985.

The postconviction court went on to find that certain documents were not turned over to counsel by the stated date and with respect to the written reports of Officer Ann Meyers, a police detective, the court said:

Ann Meyers' deposition was taken April 25, 1985, and at that time Mr. Long [defense counsel] still did not have her written reports that had been submitted to Mr. Metcalf [the prosecutor] or Mr. Metcalf's office prior to April 25, 1985.

The postconviction court found that such written reports had not been made available to defense counsel either at the time of Ann Meyers' deposition on April 25 or before Swartz's trial starting on May 9 and continuing through May 15.

With respect to Ann Meyers' reports, and their potential effect upon petitioner's criminal trial, the postconviction court found:

These reports, including the statements of McMurray regarding threats made to Smith and Swartz, may have changed the manner in which Mr. Long cross-examined McMurray and/or could have changed Mr. Long's strategy in presenting a compulsion defense asserted by Mr. Swartz.

In Swartz's criminal trial McMurray was called as a rebuttal witness for the State. Prosecutor Metcalf questioned him on direct examination, where the following questions were asked and answers given:

Q. [Mr. Metcalf] Mr. McMurray, has our office, that is, the Black Hawk County Attorney's office, promised to do anything in return for your testimony here today? A. [McMurray] Absolutely nothing.

Q. Do you intend to plead guilty at some point? A. Yes, sir, I do.

\* \* \* \* \* \*

Q. There have been overtures, haven't there, sir, of promises to have you shipped to another prison? A. Yes, sir.

In the postconviction hearing, the former prosecutor, Mr. Metcalf, testified as follows:

Q. [Mr. Bower, assistant county attorney] Did you enter into any—Strike that. What type of plea agreement did you enter into with Mr. McMurray? A. Well, there were several offers at different times. Initially I believe the offer was first degree robbery without a weapon.

Q. Do you have any recollection as to when in reference to Mr. Swartz's trial that offer was made? A. No, only that I think it was before the Swartz trial.

\* \* \* \* \* \*

Q. Were there agreements on other criminal charges involving Mr. McMurray? A. There were some overtures about the charges that may have been brought in Commerce City, Colorado, and I spoke with a female prosecutor about these.

Further, Mr. Metcalf was examined by counsel for petitioner, and the following questions and answers occurred:

Q. ... Do I understand that it was part of the proceedings on May 14th or 15th when Mr. McMurray testified, that there was some understanding between you and Mr. Mason and Mr. McMurray as to something resembling a deal, correct? A. Is that the Swartz trial date?

Q. Yes. A. Yes.

\* \* \* \* \* \*

Q. And is it also your testimony that he could go to Florida and he could receive the twenty-five year sentence without the mandatory, but that a further condition was that he testify against Mr. Swartz? A. And he was truthful, yes.

Concerning whether a deal was offered for McMurray's testimony, the postconviction court found:

The Court finds that a deal had been made between the co-defendant McMurray and the Blackhawk [sic] County Attorney's office and the understanding or agreement, for whatever reason, was not made known to Mr. Swartz or his counsel.

From the recitation of this testimony, the trial court's finding of "a deal" is supported by substantial evidence. It is obvious from the record that the "deal" involved much more than permitting McMurray to serve his time in Florida. From a review of the record of the postconviction trial when McMurray answered Mr. Metcalf's question concerning any promises for his testimony by stating, "Absolutely nothing," it is clear this answer was patently false. It is also obvious the prosecutor knew McMurray's answer was false and did nothing to mitigate the false testimony.

The postconviction court found, by implication, that the prosecutor had allowed testimony he knew to be false to be given, but made its decision denying postconviction relief on grounds that no prejudice resulted. We strongly disagree.

■ The State argues this ground for relief has been waived since it was not preserved by appeal. The State's argument must fail, however. Neither trial counsel, for purposes of posttrial motions, nor appellate counsel, reviewing the trial transcript, would be alerted to the true facts. Those were only learned after the disposition of Mr. McMurray's case was completed and when it was possible to find the facts. The true facts were not available to trial or appellate counsel at a time when the facts could have been raised.

The postconviction court also found:

At the time Mr. McMurray testified there was a court order in effect (order of May 8, 1985) permitting a psychiatric examination of Mr. McMurray regarding some alleged mental problems he had experienced in the past. This fact was also not revealed to Mr. Swartz or his counsel prior to or at the time of trial. Because of these non-disclosures [the psychiatric examination and the "deal" for McMurray's testimony], Mr. Long [counsel for Swartz] did not inquire of Mr. McMurray in the deposition or at trial any details regarding deals or understandings. The jury, of course, did not have benefit of this testimony to consider in weighing McMurray's credibility.

Despite these failures of disclosure and in spite of the false testimony given by McMurray and allowed to stand by the prosecutor, who knew the testimony was false, the trial court refused to grant postconviction relief. The court held the plea concessions for McMurray's testimony were not material because Swartz had failed to show a reasonable probability that the disclosure of the entire plea bargain would have changed the outcome of the trial. The court held the information in the Ann Meyers report would not have been helpful to Swartz if it had been furnished before the trial date. The court held the petitioner had failed to show ineffective assistance of trial counsel.

■ Exculpatory evidence in the possession of the State should have been produced for the defendant. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Cornell v. State,* 430 N.W.2d 384 (Iowa 1988). To establish a claim of improper suppression of exculpatory evidence by the State, the petitioner must prove by a preponderance of the evidence that: (1) The

prosecution suppressed evidence; (2) This evidence was favorable to the accused; and (3) The evidence was material to the issue of guilt. *Cornell,* 430 N.W.2d at 385.

Swartz's defense in this case was that both he and a codefendant, Smith, were compelled by McMurray to commit the robbery. Swartz's testimony showed he was fearful of McMurray, both for himself and for his family. The reports of Ann Meyers showed that, indeed, McMurray had threatened Swartz and Smith. Even though the reports indicated McMurray claimed the threats were made after the robbery, they are material on the issue of McMurray's threatening and overbearing nature, as claimed by Swartz.

Similarly, the failure to disclose the upcoming psychiatric examination of McMurray before he testified, or at any time during trial, was the denial of material information bearing upon McMurray's credibility. Smith would not testify at Swartz's trial, since he was also scheduled to stand trial at a later date. McMurray was the only witness, other than Swartz, to testify on the issue of compulsion. His testimony was completely at odds with Swartz's testimony on that issue. All evidence that either bore upon McMurray's threatening nature or any evidence concerning his mental health was extremely material on the compulsion issue. The suppression of that evidence was a violation of the principles of *Brady* and meets the test of *Cornell.*

Even though the violations of the *Brady* rule were serious, we agree with the State that Swartz has waived the issue of failure to produce the reports of Ann Meyers. Although we do not agree with the trial court that the failure to produce the reports did not prejudice Swartz, we agree the issue has been waived. In addition, because the evidence of McMurray's violent nature was brought into the trial, we do not believe the failure of the State to advise counsel for Swartz of the impending psychiatric examination of McMurray prejudiced Swartz's case.

■ On the issue of McMurray's testimony concerning any "deals" made for his testimony, we face a different circumstance, however. First, we cannot hold that the failure to address this issue on direct appeal constitutes a waiver of the issue. Between the time of the appeal and the time when the petitioner or counsel could have conceivably learned McMurray lied with regard to an impending deal, appellate counsel had no way of knowing or learning the testimony was false or that the prosecutor knew it was false. Accordingly, this issue was not waived.

The testimony of McMurray as a rebuttal witness in Swartz's trial has been previously set out. When asked by the prosecutor if there had been anything promised in return for his testimony, McMurray answered, "Absolutely nothing." The later discovery that this answer was untrue, and that its falsity was known to the prosecutor, makes this case a close relative to both *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and *Bagley v. Lumpkin,* 798 F.2d 1297 (9th Cir.1986), on remand from the United States Supreme Court.

In *Napue* the false testimony involved testimony concerning concessions to be made to a witness who was serving time for the same murder involved in Napue's prosecution. The witness, having been asked if anyone had offered a reward or promise for testifying, answered, "There ain't nobody promised me anything." This answer was found to be false. The United States Supreme Court stated:

First, it is established that a conviction obtained through the use of false evidence, *known to be such by representatives of the State,* must fall under the Fourteenth Amendment[.] [Citations omitted.] The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. [Citations omitted.]

The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon

such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. As stated ... in a case very similar to this one, *People v. Savvides*, 1 N.Y.2d 554, 557, 154 N.Y.S.2d 885, 887, 136 N.E.2d 853, 854, 855:

> It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.... That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.
>
> Second, we do not believe that the fact that the jury was apprised of other grounds for believing that the witness Hamer may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one.

*Napue*, 360 U.S. at 269–70, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221. (Emphasis added.)

A case involving a similar issue to that in *Napue* was *Bagley v. Lumpkin*, 719 F.2d 1462 (9th Cir.1983). In that case, Bagley was charged with drug and firearms violations. He was convicted by bench trial on December 23, 1977, of eleven counts of narcotics violations and was found not guilty on the firearms charges.

Before the beginning of trial, Bagley filed discovery motions requesting the prosecutor to disclose various items of information, including whether the government paid or promised compensation to any of its witnesses or informants. The government responded by providing affidavits from its key witnesses, James F. O'Connor and Donald E. Mitchell, each of whom stated that he had neither received nor expected compensation for his services. In fact, both of these witnesses had signed a contract with the Alcohol, Tobacco and Firearms division, entitled "Contract for Purchase of Information and Lump Sum Therefor."

In mid–1980, under the Freedom of Information and Privacy Acts, 5 U.S.C. §§ 552 & 552a (1982), Bagley discovered that O'Connor and Mitchell had in fact received money from the government both before and after the trial. These facts were not disclosed to Bagley, even though he had made a specific request for that information, pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Bagley filed a motion to vacate, set aside, or correct his sentence. After an evidentiary hearing, the district court denied the motion.

The Ninth Circuit Court of Appeals reversed the trial court, saying in part:

> In the case before us, Bagley was unaware during trial that O'Connor and Mitchell were subject to impeachment for bias based on their remunerative relationship with the government. The government's failure to disclose this *Brady* information inhibited Bagley's ability effectively to cross-examine two important prosecution witnesses.

*Bagley*, 719 F.2d at 1464. In fact, O'Connor and Mitchell were the only witnesses against Bagley.

The court continued:

> Standing alone, the government's failure to produce requested *Brady* information is a serious due process violation. [Citation omitted.] In fact, this failure is "seldom, if ever excusable." *United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342, 351 (1976). But a failure to disclose requested *Brady* information that the defendant could use to conduct an effective cross-examination is even more egregious because it threatens the defendant's right to confront adverse witnesses, and therefore, his right to a fair trial. [Citation omitted.]
>
> For these reasons, we hold that the government's failure to provide requested *Brady* information to Bagley so that he could effectively cross-examine two important government witnesses requires an *automatic reversal*.

*Bagley*, 719 F.2d at 1464 (emphasis added).

The United States Supreme Court granted certiorari to the Ninth Circuit Court of Ap-

peals and reversed and remanded the case for a determination as to whether:

> there is a reasonable probability that, had the inducement offered by the Government to O'Connor and Mitchell been disclosed to the defense, the result of the trial would have been different.

*United States v. Bagley,* 473 U.S. 667, 684, 105 S.Ct. 3375, 3385, 87 L.Ed.2d 481, 495 (1985).

In *Bagley,* the Supreme Court analyzed the relevant line of cases which followed *Brady.* In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Court divided the *Brady* violations into three categories, stating:

> The rule in *Brady v. Maryland,* 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194, arguably applies in three quite different situations. Each involves the discovery, after trial, of information which had been known to the prosecution but unknown to the defense.

*Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d at 349. The three situations include:

1. The situation involving the prosecution's knowing use of perjured testimony or, equivalently, the prosecutor's knowing failure to disclose that the testimony used to convict a defendant was false.

2. The situation posed where defense counsel makes a request for specific evidence and the prosecutor fails to disclose responsive evidence.

3. The situation in which defense counsel makes no request at all for *Brady* information—or in which defense counsel simply asks for "all *Brady* material" or for "anything exculpatory"—and the prosecutor fails to disclose certain evidence favorable to the accused.

*Agurs,* 427 U.S. at 103–07, 96 S.Ct. at 2397–2399, 49 L.Ed.2d at 349–52.

With respect to the first category of cases, the *Agurs* Court stated that "the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is *any reasonable likelihood that the false testimony could have affected the judgment of the jury.*" *Id.,* 427 U.S. at 103, 96 S.Ct. at 2397,

49 L.Ed.2d at 349–50. (Emphasis added.) The Court in *Agurs* justified this standard of materiality on the ground that the knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves a corruption of the truth-seeking function of the trial process. *Id.,* 427 U.S. at 104, 96 S.Ct. at 2397, 49 L.Ed.2d at 350. With respect to the second category, the *Agurs* Court stated:

> When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.

427 U.S. at 106, 96 S.Ct. at 2399, 49 L.Ed.2d at 351.

Two subsequent cases have relied on and reformulated the *Agurs* standard for the materiality of undisclosed evidence arising out of the *Brady* context. In neither case did the Court's discussion of the *Agurs* standard distinguish among the three situations described in *Agurs.* In *United States v. Valenzuela–Bernal,* 458 U.S. 858, 874, 102 S.Ct. 3440, 3450, 73 L.Ed.2d 1193, 1207 (1982), the Court held that due process is violated when testimony is made unavailable to the defense by government deportation of witnesses *"only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact."* (Emphasis added.) Secondly, in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court held that a new trial must be granted when evidence is not introduced because of the incompetence of counsel only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698.

Adopting the *Strickland* test, the Supreme Court in *Bagley* ruled:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Id.,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494.

Commenting on the effects of *Brady* violations, the *Bagley* Court said:

The Government notes that an incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued.

We agree that the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process in this manner. And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption. This possibility of impairment does not necessitate a different standard of materiality, however, for under the *Strickland* formulation the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

*Id.,* 473 U.S. at 682–683, 105 S.Ct. at 3384, 87 L.Ed.2d at 494.

In *Bagley,* the Court was dealing with the prosecutor's failure to furnish information that compensation was being furnished for information and incriminating testimony. The prosecutor did not know of the deal offered to the two witnesses. In the present case, the prosecutor knew that McMurray had been offered concessions for his favorable testimony, and the prosecutor knew that McMurray's answers to the prosecutor's questions were false. Being fully aware of this false testimony, the prosecutor did nothing to correct the situation or to insist upon the truth being known. He accepted the benefit of knowingly false testimony.

It appears, however, that the United States Supreme Court has backed away from its former stand that a conviction obtained by the knowing use of perjured testimony, or the uncorrected use of perjured testimony when it appears, must necessarily fall under the Fourteenth Amendment. *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (establishment of the rule that knowing use by a state prosecutor of perjured testimony to obtain a conviction constitutes a denial of due process).

Under its ruling in *Bagley,* the United States Supreme Court adopted the test that even in the case of the presentation of perjured testimony, the decisive factor is the materiality of the evidence. The test to determine materiality seems to be whether a reasonable probability exists that the result of the proceeding would have been different if the prosecutor had advised counsel for the defendant of the concessions that had been agreed upon for the witness's testimony or of the fact that the witness did not tell the truth.

As stated in *Bagley:*

In the present case, we think that there is a significant likelihood that the prosecutor's response to respondent's discovery motion misleadingly induced defense counsel to believe that O'Connor and Mitchell could not be impeached on the basis of bias or interest arising from inducements offered by the Government.

*Id.,* 473 U.S. at 683, 105 S.Ct. at 3384, 87 L.Ed.2d at 495.

■ In the present case, the record indicates a knowing and apparently deliberate use of perjured testimony. In the strongest language appropriate to this situation, we condemn this practice. Perjury and the subordination of it are crimes in this state. The use of perjury as a weapon, whether active or passive, and whether by the prosecution or defense, must be severely condemned. The fact that we must test its use in this case for

its materiality under the rules laid down in *Bagley* does not make the prosecution's conduct in this case any less egregious. Here, as in *Bagley*, we think a significant likelihood exists that the prosecutor's actions "misleadingly induced defense counsel to believe that [McMurray] could not be impeached on the basis of bias or interest arising from inducements offered by the [State]." *Id.*

In *Bagley*, the Supreme Court remanded the case to the Court of Appeals "for a determination whether there is a reasonable probability that, had the inducement offered by the Government to O'Connor and Mitchell been disclosed to the defense, the result of the trial would have been different." *Id.*, 473 U.S. at 684, 105 S.Ct. at 3385, 87 L.Ed.2d at 495. Upon remand, the Court of Appeals found that by failing to advise defense counsel of the inducements offered to these witnesses, the government unconstitutionally interfered with Bagley's right to a fair trial.

The rule laid down by the Supreme Court in *Bagley* requires us to determine whether a reasonable likelihood exists that the result would have been different had the fact of the false testimony been made known to the defendant. In that determination, we must decide if the failure to disclose the "deals" made or the perjured testimony undermines the confidence in the outcome of the trial.

At Swartz's trial, the important issue was whether Swartz was compelled by McMurray to commit the robbery involved in this case. Smith, the only other participant in the robbery, was not available to testify since he claimed the benefit of his right to refuse to incriminate himself. Smith was scheduled for trial at the time. Smith's defense, like that of Swartz, was that he was compelled to commit the robbery due to his fear of the consequences to himself and his family.

McMurray had also refused to testify in Swartz's trial. McMurray did, however, agree to testify in rebuttal as a State's witness, and McMurray's testimony directly conflicted with Swartz's evidence on the compulsion issue. Thus, McMurray was the only witness available to testify about whether Swartz and Smith were willing participants in the robbery, and McMurray's testimony in

opposition to Swartz's testimony was crucial, both to the State and to the defense.

When considering the entire record and the totality of the circumstances, we hold that the false testimony, going as it did to the credibility of the only witness who disputed Swartz's compulsion testimony, was material and interfered with Swartz's constitutional right to a fair trial. The use of false testimony by the prosecutor in this case undermines confidence in the outcome of Swartz's criminal trial and raises a reasonable probability that without such perjured testimony the result would have been different.

Accordingly, we reverse the postconviction court and remand the case to the district court for a new trial on the original criminal charge.

**REVERSED AND REMANDED.**